## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

KRISTI HOLT,                          )
                                      )
         Plaintiff,                   )
                                      )
v.                                    )         Cause No.: 1:06-CV-210
                                      )
MARION COMMUNITY SCHOOLS,             )
                                      )
         Defendant.                   )

### MEMORANDUM OF OPINION AND ORDER

This matter is before the court on the motion for summary judgment filed by the

Defendant, Marion Community Schools ("Defendant" or "School District") on June 1, 2007.

Plaintiff Kristi Holt ("Plaintiff" or "Holt") filed a response in opposition to the motion on July

18, 2007, and Defendant filed a reply on August 2, 2007.  For the reasons discussed in this

Order, the motion is DENIED.

### BACKGROUND

Kristi Holt was employed by the Marion Community Schools in Marion, Indiana, from

January of 1996 until August of 2005.  Complaint, Docket at 1; Defendant's Designation of

Evidence, Docket at 25, Exhibit A, Deposition of Kristi Holt ("Holt Deposition"), pp. 26-28.

She was hired originally as a secretary at Jones Middle School, one of ten schools within the

Marion Community School system.  Defendant's Brief in Support of its Motion for Summary

Judgment ("Defendant's Brief"), Docket at 24, p. 2.  She worked in that position until 2002,

when she asked for and received a transfer to the position of SASI secretary at Marion High

School.  Holt Deposition, pp. 28-29.  The SASI secretary "is in charge of data entry and

maintenance of the Student Management Data System . . . which houses all student information

such as schedules, grade transcripts, and related information." Defendant's Brief, p. 2. Holt remained in that position until she was terminated in August of 2005. Holt Deposition, p. 29.

At the time of the events giving rise to this lawsuit, the Superintendent of the Marion Community Schools was Andrew M. Nixon, Ed.D. ("Nixon"), the Assistant Superintendent for Personnel was Dr. Therese Howe ("Howe"), and the Principal of Marion High School was Jack Gardner ("Gardner"). Defendant's Brief, p. 3.

According to the Defendant, "over the last several years the Marion Community Schools has suffered substantial budgetary shortfalls and has struggled with meeting its educational obligations. As a consequence it has been forced to adopt a variety of budget cutting strategies, including closing/consolidating schools, eliminating administrative positions, and laying off non-educational employees." *Id.*, p. 4; Affidavit of Andrew Nixon ("Nixon Aff."), Docket at 29, ¶ 2; Affidavit of Jack Gardner ("Gardner Aff."), Docket at 26, ¶ 3. As a result of these budgetary constraints, the School District conducted "a variety of financial studies . . . [that] showed that the School was significantly overstaffed at the administrative and clerical levels . . . ." *Id.*, p. 4. Consequently, the School District imposed a freeze on secretarial pay levels on July 1, 2004. *Id.*

When the financial outlook did not improve, a "Clerical Salary Survey was conducted that revealed that when wages and benefits were considered, clerical personnel at Marion were earning more than any of their counterparts in the region." *Id.*, p. 5; Nixon Aff., ¶ 5. In an effort to address this issue, the School District changed all clerical job descriptions, eliminated several positions, and created some new positions by consolidating job responsibilities." *Id.* Clerical employees who were affected by this restructuring process were allowed to remain in their existing but restructured position; "apply for other open positions"; or resign or retire. *Id.*

2

"Following the implementation of the restructuring plan, many clerical employees were reassigned, resigned, retired, or were terminated." *Id*.; Nixon Aff., ¶ 18.

At Marion High School specifically, secretarial employees "were advised that three (3) secretarial positions at the High School were being eliminated and that the remaining eight (8) positions, including that of Secretary to the Athletic Director, would receive different duties and/or reduced salary and/or reduced hours." *Id*.; Affidavit of Therese Howe ("Howe Aff."), Docket at 27, ¶ 3. Following this restructuring, Holt remained in her position as SASI secretary. Howe Aff., ¶ 4. However, Holt's work hours were cut by one hour per day. *Id*.

Another secretary at Marion High School, Sharon Green, who held the position of secretary to the Athletic Director, opted to retire as of June 9, 2005. *Id*., ¶¶ 5 and 6. Green's former position was then "eliminated and the duties were rolled into a new position entitled Director of Student Activities, which had numerous additional athletic and coaching responsibilities." Defendant's Brief, p. 6; Howe Aff., ¶ 7; Defendant's Exhibits C and D. The new position paid more than Green's secretarial position had paid, but according to the Defendant, "ultimately saved the School money because with the increased duties it eliminated multiple other positions." *Id*.; Howe Aff., ¶ 8. The School District contends that there was only one internal applicant for the new position of Director of Student Activities and that applicant was female. *Id*. However, that applicant had listed the new position "as her second choice, and eventually received the position listed as her first choice." *Id*. The new position was given to Bennett Summersett, a male whose previous position was educational aide and assistant athletic director. *Id*. Summersett's assistant athletic director position was one that had been "rolled into the newly restructured Director of Student Activities position." *Id*.; Howe Aff., ¶ 10;

Defendant's Exhibit E.

On May 25, 2005, a meeting was held in Gardner's office.  *Id*., p. 7.  In attendance were Gardner, "Bookkeeper Judy Ackley, Officer Manager Linda Osborne, Assistant Principal Carol Matchette, Head Guidance Counselor Ron Vermilion . . . and [Kristi] Holt."  *Id*.; Holt Deposition, pp. 56-57.  During the meeting, Holt expressed dissatisfaction with the restructuring and how it affected secretaries.  *Id*.; Holt Deposition, p. 58.  Specifically, Holt testified, she told Gardner that she "and the other secretaries agreed that with the secretaries taking a pay cut, it would be a lot easier to swallow if the administrators took a pay cut also."  Holt Deposition, p. 58.  Holt testified that Gardner became very angry and "slammed his fist on the desk . . . ."  *Id*., p. 60.  Holt also testified that Gardner screamed at her.  *Id*.  According to the School District, it was Holt herself who became upset and angry at the meeting.  Defendant's Brief, p. 7.  The School District claims that "[t]he other members at the meeting could tell that Ms. Holt was upset during her confrontation with the Principal."  *Id*.  Ron Vermilion stated in an affidavit that "Holt was very angry during the meeting and repeatedly accused the Principal of not standing up for her because she alleged she was taking a cut in her salary."  Affidavit of Ron Vermilion ("Vermilion Aff."), Docket at 28, ¶ 3.  Vermilion also stated that Gardner "asked Holt to control herself, but Holt continued to speak angrily toward the Principal."  *Id*., ¶ 4.  Vermilion stated that "Holt finally stopped criticizing the Principal when he told her that she was putting her job in jeopardy by not being respectful toward him or the others at the meeting."  *Id*., ¶ 5.  In her deposition, Holt admitted that she was angry during the meeting, but denied raising her voice.  Holt Deposition, p. 61.

Some time after the meeting, Gardner placed a card on Holt's office door that read as follows:

> Kristi, I have never said anything other than positive things either to you or about you. How can you not know I think the world of you! Please don't confront in front of others like that again!! Hope you are okay! Jack Gardner.

Holt Deposition, Exhibit 18. Holt testified during her deposition that she felt the note referred to the May 25 meeting. *Id.*, p. 115. Holt also testified that she apologized to Gardner and "told him if he felt like he needed to discipline me at that time, that if he wanted to write me up, that he could. And he declined to do so." *Id.*, p. 62. About a month after the meeting, Gardner gave Holt another greeting card. Defendant's Brief, p. 8. This one read "Thank You" on the front of it and Gardner wrote the following note on the inside:

> Kristi, I know this is a difficult time for you. So many strange things have been happening around us! I just want you to know how much I value you. You are a very important member of our MHS team. Please hang in there!! Jack.

Holt Deposition, Exhibit 19. For her part, Holt testified that beginning in late June of 2005, Gardner "quit talking to me, was very short with me, a totally different way of treating me . . . ." *Id.*, p. 83. The School District, however, characterizes Gardner's efforts in the months following the May 25, 2005, meeting as "efforts to try and improve the relationship and Ms. Holt's attitude . . . ." Defendant's Brief, p. 8.

According to the Defendant, Holt "left her assigned position during the workday" on July 27, 2005, "and went down to the office of Athletic Director Rocky Kent to confront him about her unhappiness about the athletic program, get a copy of her son's physical, and tell him that she was transferring her son to another school because she was upset about the way he was being treated." *Id.*, p. 9. Holt conceded that she went to Kent's office, and testified that she told him:

5

"I felt that it was discrimination that Bennett Summersett, the assistant basketball coach, was hired in place of Sharon Green at a higher rate of pay for which she retired because she got a pay cut.  Holt Deposition, p. 70.  Holt also testified, however, that when she went to Kent's office to get the copy of her son's physical, Kent was "very confrontational" and that he "started yelling at me."  *Id.*  Holt did not testify that she was "upset about the way [her son] was being treated," nor did she state that she was "confronting" Kent as the School District characterizes the episode.

On July 29, 2005, Gardner held a meeting with Holt and Assistant Principal Matchette "to discuss Ms. Holt's inappropriate conduct."  Defendant's Brief, p. 10.  According to the Defendant, "Gardner discussed the prior problems with Ms. Holt's insubordinate behavior, her involvement in improper rumors regarding the staff at Marion High School, and her confrontation with Mr. Kent."  *Id.*  Gardner stated in his affidavit that following the May 25 meeting, Holt "treated support staff . . . with utter disrespect and disdain."  Gardner Aff., ¶ 8.  He also stated that [Holt's] "attitude was impossible and she began spreading disruptive rumors about me and my staff."  *Id.*, ¶ 9.  Gardner also claimed that Kent "informed me that during this confrontation [between Kent and Holt] Ms. Holt was loud and abusive towards him."  *Id.*, ¶ 12.[1] Gardner stated that "[b]ased upon her prior behavior and her attitude during this meeting, I determined that it would be necessary to recommend Ms. Holt's termination."  *Id.*, ¶ 13.

---

[1] The School District did not submit an affidavit or deposition testimony from Kent, so the truth of what took place during the meeting between Kent and Holt is a disputed fact issue. The same is true in a more general sense regarding Holt's words and actions at other relevant times.  The Defendant characterizes her as "angry," "abusive," "confrontational," and "insubordinate." While Holt conceded several times during her deposition that she was angry about the restructuring, she also testified that Gardner and Kent, among others, were abusive and confrontational towards *her*, rather than the other way around.

Gardner stated that he gave Holt the opportunity to resign, but that she refused, saying, "Jack, I want you to fire me." *Id*. Gardner then recommended to the Superintendent that Holt be terminated "due to the complete break down in her working relationship with me and Marion High School." *Id*., ¶ 14.

Gardner informed Holt of his decision in writing by way of a letter dated August 1, 2005. In that letter, Gardner stated in part as follows:

> This letter is written to let you know officially that I am recommending to Dr. Nixon . . . that you be terminated as a secretary at Marion High School.
>
> . . .
>
> [S]ince the district restructured MCS secretary pay, hours, and number of days to be worked, you have been a continual source of disruption and discontent.
> . . .
>
> Much to my disappointment, your behaviors did not calm down. During the past two months, it has come to my attention that you have been a central figure in disrupting the transition of our new Marion High School office staff and making things unpleasant. It has been reported to me that you have a part of passing along false stories about myself.
> . . .
>
> The number of stories I have heard and your intense efforts of spreading ill-will are simply too numerous to mention in this letter. For the past several weeks this intense attack on my decisions and impact on the reputations of others has created a situation where I do not see how you can be a successful member of our new team.
> . . .
>
> I know that others [sic] members of our office staff have tried to counsel you to improve your attitude, but to no avail.
> . . .
>
> Again, because of the complete break down in your working relationship with myself and Marion High School you have given me no alternative other than to sever our relationship and recommend that you be terminated . . . ."

Gardner Affidavit, Exhibit A. Gardner informed Holt in the letter that her "last full day of pay is

Friday, July 29, 2005.  At a meeting held on August 10, 2005, the Board of School Trustees

agreed to terminate Holt, effective August 1, 2005.  Howe Aff., ¶ 11; Exhibit F.

As a result of her termination, Holt filed her Complaint against Marion Community

Schools, alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964,

as amended; unlawful retaliation under Title VII; and a state law claim for wrongful termination.

Complaint, Docket at 1.  Since the filing of her Complaint, Holt has "voluntarily dismissed her

wrongful termination claim" and "has decided not to pursue her Title VII sex discrimination

claim.  Therefore, only Plaintiff's Title VII retaliation claim remains at issue in this matter."

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's

Response"), Docket at 33, p. 1.  The Defendant acknowledges that it "seeks summary judgment

on the sole remaining Count, the Title VII retaliation claim . . . ."  Defendant's Brief, p. 2.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his

opponent's claim.  *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.

1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552-53 (1986).  The standard for

granting summary judgment mirrors the directed verdict standard under Rule 50(a), which

requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir. 1988); *Guenin v. Sendra Corp.*, 700 F. Supp. 973, 974 (N.D. Ind. 1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960 (1983).

In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not

weigh the evidence or the credibility of witnesses.  *Anderson*, 477 U.S. at 249-251, 106 S. Ct. at

2511.   In the context of employment discrimination cases, "[i]f the employee succeeds in casting

doubt on the proffered reasons for dismissal, the ultimate question of whether the employer

discriminated against the employee must be left for a jury to consider."  *O'Connor v. DePaul*

*University*, 123 F.3d 665, 670 (7th Cir. 1997).  Summary judgment is particularly inappropriate

for resolving issues involving intent or motivation.  *Connor v. Reinhard*, 847 F.2d 384, 393-94

(7th Cir.), *cert. denied*, 488 U.S. 856 (1988).

## DISCUSSION

Holt bases her retaliation claim on the fact that she allegedly engaged in protected

activity when she complained about the effects of the restructuring on secretaries employed by

the School District and was terminated soon after expressing her discontent.  "Under Title VII's

anti-retaliation provision, it is unlawful for an employer to 'discriminate against' an employee

'because he has opposed any practice made an unlawful employment practice' by the statute . . .

."  *Roney v. Illinois Dept. of Transportation*, 474 F.3d 455, 458 (7th Cir. 2007) (citing 42 U.S.C.

§ 2000e-3(a)).  A plaintiff asserting a retaliation claim in violation of Title VII can prove such a

claim by using either the direct or indirect method of proof.  *Tomanovich v. City of Indianapolis*,

457 F.3d 656, 662-63 (7th Cir. 2006).  In this case, Holt is proceeding under the direct method of

proof.  Plaintiff's Response, p. 6.  In order to establish a *prima facie* case of retaliatory discharge

under the direct method of proof, a plaintiff must establish: 1) she engaged in protected activity;

2) she suffered an adverse employment action; and 3) there exists a causal connection between

the plaintiff's protected activity and the adverse employment action.  *Graham v. AT&T Mobility,*

*LLC*, 2007 WL 2565999 (7th Cir. (Ill.) Sept. 27).  Within the umbrella of the direct method of

proof, a plaintiff can present either direct or circumstantial evidence of retaliation. *Id.* Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* Circumstantial evidence "allows a jury to infer intentional discrimination by the decision-maker." *Id.* In the absence of direct evidence, circumstantial evidence must present "a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Department Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Circumstantial evidence of retaliation can include: 1) suspicious timing, ambiguous statements, or discrimination toward other employees; 2) evidence that similarly situated employees were treated differently; or 3) evidence that the employee did not deserve termination and that the employer's reason for termination was a pretext for discrimination. *Volovsek v. Wisc. Dept. of Agric.*, 344 F.3d 680, 689-90 (7th Cir. 2003).

Holt argues that she engaged in protected activity when she complained during the May 25, 2005, meeting that the secretarial pay cuts were unfair. Plaintiff's Response, p. 7. She argues that she also engaged in protected activity when she raised the same complaints during her meeting (or confrontation, according to the Defendant) with Athletic Director Kent. During the May meeting, Holt made her comments that she "and the other secretaries agreed that with the secretaries taking a pay cut, it would be a lot easier to swallow if the administrators took a pay cut also." Holt Deposition, p. 58.[2] During her meeting with Kent, Holt again expressed her belief that she "didn't support what was going on" and that she "felt that it was discrimination that Bennett Sommersett, the assistant basketball coach, was hired in place of Sharon Green at a

---

[2] It is undisputed that at the time Holt made her complaint or protest to Gardner at this May 25, 2005, meeting, all the secretaries working for the School District were female.

higher pay rate for which she retired because she got a pay cut." *Id.*, p. 70.

The School District states that "[t]here is no direct evidence that Ms. Holt complained about the Ms. Green/Mr. Summersett [sic] situation and then was terminated for it." Defendant's Brief, p. 16. Rather, according to the Defendant, Holt's termination was "simply the culmination of a three month long breakdown in the working relationship between Ms. Holt and Principal Gardner which she herself admitted in her deposition began long before Mr. Summersett [sic] was even hired." *Id.* The School District then makes a confusing, and apparently blatantly wrong, argument. The School District states that "there is no link between the breakdown in her relationship with Principal Gardner and her complaints of discrimination since the breakdown began long before the complaints." *Id.*, p. 17. In support of this contention, the School District quotes a portion of Holt's deposition in which she stated that "At the end of June, Mr. Gardner quit talking to me, was very short with me, a totally different way of treating me as opposed to prior to everyone leaving." *Id.* (quoting Holt Deposition, p. 83). So, the School District alleges that since the breakdown in the Holt/Gardner working relationship began in late June, and Sommersett was not hired into the newly created position of Director of Student Activities until July 14, 2005, (see Howe Aff., ¶ 10 and Exhibit E), the alleged incident of discrimination had not occurred until *after* the breakdown that was the ultimate cause of Holt's termination. But this argument completely ignores the fact that Holt first raised her complaint of unfair treatment at the May 25 meeting. Then, when she complained again of what she perceived as "discrimination" during her meeting with Kent, Sommersett had been hired into the new position about two weeks prior. Therefore, the evidence does not support the School District's contention that Holt's relationship with Gardner began to break down long before Holt ever lodged any

12

complaints about perceived discrimination.

The School District argues that "[a]t best, Ms. Holt can simply point to the temporal proximity of her complaints and her termination."  Defendant's Brief, p. 17.  But the School District is quick to point out that "'mere temporal proximity between the [protected activity] and the action alleged to have been taken in retaliation . . . will rarely be sufficient in and of itself to create a triable issue.'"  *Id.* (quoting *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

The School District goes on to argue that Holt cannot make out a *prima facie* case of retaliation because she did not engage in any protected activity.  *Id.*  The School District states that "'utterly baseless claims do not receive protection under Title VII.'" *Id.* (quoting *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890 (7th Cir. 2004)).  The School District argues that Holt's complaints were not truly complaints about any sort of discrimination and, since they were not "objectively reasonable" they cannot constitute opposition to an unlawful practice.  *Id.*, (citing *Hamner v. St. Vincent Hospital*, 224 F.3d 701 (7th Cir. 2002)).  It is true, as the holding in *Hamner* explains, that "[i]f a plaintiff opposed conduct that was not proscribed by Title VII, no matter how frequent or severe, then his sincere belief that he opposed an unlawful practice cannot be reasonable."  *Hamner*, 224 F.3d at 707.

The School District frames its argument as follows:

In the present case Ms. Holt could not have reasonably believed that she was complaining about any conduct that would constitute discrimination under Title VII.  The undisputed evidence is that Sharon Green, the former Secretary to the Athletic Director, never even applied for the new position, instead she chose to retire as of June 9, 2005. . . . Moreover the position of Secretary to the Athletic Director was eliminated and the duties of the athletic director secretary were rolled into a new position entitled Director of Student Activities with a much broader job description. . . . There was only one internal restructuring applicant

for the new Director of Student Activities position, Cinda Vermilion, who
accepted another position. . . . Following an interview process, the position was
eventually filled by . . . Bennett Summersett . . . ."

Defendant's Brief, p. 18.  Since Holt was aware of the fact that Sharon Green retired rather than

apply for the new position, the School District concludes (and asks the court to conclude) that

"[b]ecause it is not possible for any sex discrimination to have occurred Ms. Holt did not have

and could not have had a subjective, good faith belief that she opposed an unlawful practice, nor

was any belief objectively reasonable as any complaints she did make did not involve

discrimination prohibited by Title VII."  *Id*

　　　　The problem with the School District's argument is that it requires a leap of logic at

several stages and ignores much of Holt's deposition testimony.  Holt argues that the School

District's arguments actually attack the "legal sufficiency of Plaintiff's initial sex discrimination

claim[.]" and that she does not have to "succeed on her discrimination claim to make out a *prima*

*facie* case of retaliation."  Plaintiff's Response, p. 8 (citations omitted).  Holt then argues that she

has "produced evidence that Green did not apply for the athletic secretary position because she

was told she would have to take a pay cut[.]"; that it is uncontested "that Sommersett received a

higher salary than Green[.]"; and that "Defendant changed the position title from 'Athletic

Director Secretary' to 'Director of Student Activities' after Plaintiff complained of

discrimination."  *Id*.  Therefore, argues Holt, she meets the first prong of her *prima facie* case

because the factual evidence supports her contention that she complained about unlawful

discrimination, and that her complaints were objectively reasonable under the circumstances.

14

As for the second prong of Holt's *prima facie* case, it is uncontested that she suffered an adverse employment action when she was fired on August 9, 2005 (effective August 1, 2005). Turning to the third prong, the court must examine whether Holt establishes that there was a causal connection between her complaints and her termination. The most glaring evidence of this, according to Holt, is the fact that she complained of discrimination on May 25, 2005, and July 27, 2005, and was fired on August 1, 2005. While it is true, as the School District points out, that mere temporal proximity itself is generally insufficient to establish the causal connection, it is likewise true that when an adverse employment action comes swiftly on the heels of protected activity, it gives rise to an inference of discriminatory intent. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994). In this instance, Holt's termination came slightly more than two months after she first complained about the alleged discriminatory impact of the restructuring, and only a matter of days after she complained to Kent. To establish the requisite causal connection, a plaintiff must show "that the protected activity and the adverse action were not wholly unrelated." *Sauzek v. Exxon Coal USA*, 202 F.3d 913, 918 (7th Cir. 1997) (internal citations omitted). "Suspicious timing constitutes circumstantial, or indirect, evidence to support a claim of retaliation." Plaintiff's Response, p. 9 (citing *Troupe,* 20 F.3d at 736)).[3]

In addition to the timing of her termination, Holt points to comments made by Gardner which she alleges are evidence of discriminatory animus. For example, Gardner admitted that he told Holt during the May 25, 2005, meeting that she was "putting her job in jeopardy" after she complained about what she perceived as unfair treatment of the (female) secretaries. Gardner

---

[3] Holt also points out, and the School District does not dispute, that she never received any written discipline during her employment prior to her termination. Holt maintains that this fact adds to the suspiciousness of the timing of her termination.

Aff., ¶ 7.  (Of course, Gardner and the School District take the position that his comment referred to the rudeness and disrespect that Holt showed during that meeting rather than to her complaints of unfair treatment.)  Also, Holt testified that when Gardner confronted her about her meeting with Kent, and insisted on knowing whether she had accused him of discrimination in the hiring of Sommersett, "Gardner became enraged by Plaintiff's response and began screaming at Plaintiff.  Principal Gardner told Plaintiff, 'How dare you question my judgments, my decisions, Dr. Nixon's decisions.  You have no right.  I can't trust you.  I can't work with you.  I just can't work with you anymore.'"  Plaintiff's Response, p. 10; Holt Deposition, p. 80.  Holt also testified that Gardner told her "you need to resign."  *Id*.  When Holt responded that she had no intention of resigning, Gardner allegedly said, "Well, then you're fired."

Taken in their entirety, Holt contends that these facts and circumstances not only establish a *prima facie* case of retaliation, but also provide evidence of discriminatory animus. The court believes that when the facts and evidence are viewed in a light most favorable to Holt they raise a genuine issue of material fact.  The School District presents a scenario in which Holt is simply an angry and disgruntled employee once she learns that she will be paid less in her job after the restructuring.  The School District paints a picture of an employee who became belligerent and disrespectful towards her supervisor and other employees after her work hours were cut by one per day.[4]  When she allegedly failed to correct her behavior and attitude, and after her working relationship with Gardner suffered a breakdown, Gardner and the School

---

[4]  The School District maintains that this one hour per day reduction was "[t]he only affect the restructuring had on [Holt]" and that "Holt remained at the top of the pay scale, at $15.50 per hour, and had the highest number of days of any secretarial position with the School, 260 days." Howe Aff., ¶ 4.  Holt concedes that, but points out that even a reduction of $15.50 per day equals a pay cut of over $4,000.00 over the 260-day work year.  Holt Deposition, p. 82.

District were left with no alternative but to terminate her.  Holt, on the other hand, testified that any breakdown in her relationship with Gardner or anyone else occurred only after she complained during the May 25, 2005, meeting of what she perceived to be discriminatory treatment of female secretaries as a result of the restructuring.  Then, a few days after she reiterated her complaints to Athletic Director Kent and Gardner confronted her about it, she was fired.

The facts and evidence in this case present many fact issues concerning intent, motivation and credibility.  Such determinations can only be made by a jury and are completely inappropriate for resolution at the summary judgment stage.  Whether Holt had a reasonable subjective belief that she was complaining about unlawful discrimination is a matter for a jury to resolve, as is the issue of Gardner's intent when he made certain questionable comments to Holt after she voiced her complaints.  In addition, credibility issues exist on both sides in this case, especially with regard to whether Holt was rude, insolent and insubordinate towards others or whether Gardner and others displayed anger and animosity towards her.  Whether Holt was fired in retaliation for having complained about alleged discrimination against female secretaries or because she was insubordinate is an issue that can only be resolved after the credibility of the witnesses (especially Holt and Gardner) is determined by a jury.  For this reason, the School District cannot prevail on its motion.

**CONCLUSION**

For the reasons set forth herein, the motion for summary judgment filed by the

Defendant, Marion Community Schools, is DENIED


Date: October 15, 2007.

  /s/   William C. Lee
William C. Lee, Judge
United States District Court
